996 A.2d 961

**Paul EDERY, et al.**

v.

**Shlomo EDERY, et al.**

**No. 723, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

June 3, 2010.

Eric H. Singer of Rockville, MD, for appellant.

M. Christina Hamilton (Goren, Wolff & Orenstein, LLC, on the brief), Rockville, MD, for appellee.

Panel: HOLLANDER, *SALMON, JAMES P., MEREDITH, JJ.

MEREDITH, J.

In this case, we will review the Maryland statute that addresses decisions about the disposition of the body of a deceased person—Maryland Code (1982, 2005 Repl. Vol., 2008 supp.), Health–General Article ("HG"), § 5–509—in the context of a dispute among siblings regarding the proper burial place for their mother. Four of the siblings—Shlomo Edery, David Edery, Michael Ben–Canaan, and Hanna Ben–Yehouda ("the majority siblings"), appellees—filed a complaint in the Circuit Court for Montgomery County, seeking that court's authorization for them to make all necessary decisions regarding the final disposition of their mother's body, to the exclusion of two of their brothers, Hanan Edery and Paul Edery, appellants. The majority siblings alleged that their mother, Sultana Edery, desired to be buried in Montgomery County, Maryland. Hanan and Paul responded that it was their mother's wish to be buried in Israel, near her deceased husband and a son who had predeceased her. After a hearing, the circuit court authorized the majority siblings to make final arrangements, and enjoined Hanan and Paul from interfering with that process.

Hanan and Paul appealed. Although the mother is now interred in the Mt. Lebanon Cemetery in Prince George's County, Hanan and Paul have not abandoned their quest to have their mother's body laid to rest in Israel. We conclude that the circuit court erred in excluding relevant evidence about Sultana's wishes regarding the final disposition of her body. Accordingly, further proceedings may be required to

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

resolve this dispute, and we will remand the matter to the Circuit Court for Montgomery County.

## Factual Background and Proceedings

Sultana Edery was born in Morocco on January 1, 1923. While living in Morocco, she married and bore six children. The family moved from Morocco to Israel in July 1956, and a seventh child, appellee Shlomo, was born there. Beginning in 1966, five of the children emigrated to the United States. Avi, who died in Jerusalem in 1972, is buried in Israel; and appellee Hanna Ben–Yehouda still resides in Israel. In the late 1980s, Sultana and her husband moved to the United States, and settled in Montgomery County, Maryland. In 1989, Sultana's husband returned to Israel, where he died and was buried in the same cemetery as the couple's late son, Avi.

Although Sultana could speak in Hebrew, Arabic, French, and Spanish, she could not read or write any language. In July 2003, with the assistance of an attorney, Sultana executed three documents: (1) a living will and advance directives, (2) a durable power of attorney, and (3) a last will and testament. None of these documents said anything one way or the other about Sultana's wishes regarding the disposition of her body following her death. Each of these documents was signed with only her initials, as was her usual custom. On or about February 10, 2007, Paul Edery mailed a copy of the documents to Michael Ben–Canaan, one of the appellees.

In January 2009, Sultana was a patient in the intensive care unit of Shady Grove Hospital, and the family members feared she did not have long to live. Differences of opinion arose among the siblings as to what to do with respect to burial once their mother passed away. The majority siblings took the position that Sultana should be buried in Montgomery County, but Hanan and Paul took the position that their mother should be buried in Israel.

The four siblings who favored burial in Montgomery County filed suit against brothers Hanan and Paul in the Circuit Court for Montgomery County. The complaint sought the

following relief: (1) that the court grant the majority siblings legal authority "to arrange for and make decisions regarding the final disposition of Sultana Edery upon her death"; (2) that the court issue an injunction enjoining Hanan and Paul from removing the body of Sultana from the State of Maryland after her death; and (3) that the court issue a declaratory judgment declaring the respective rights of the parties relative to their mother's final disposition after death. Because they had been advised by Sultana's physicians that she could die at any moment, the majority siblings also requested a temporary restraining order and preliminary injunction to prevent Hanan and Paul from removing Sultana's body from the State of Maryland upon her death. A temporary restraining order was issued by the court, and a hearing was scheduled on the request for preliminary injunction.

Hanan and Paul responded with a petition to rescind the protective order, advising the court: "It was our mother's wish to be buried in Israel. She dictated and signed a statement to this effect on July 30, 2006." Hanan and Paul attached to their response a number of affidavits and documents, including a copy of a document that was hand-written in Hebrew, accompanied by a certificate from a translator who stated that the document, dated July 30, 2006, is translated as follows: "I, Sultana Edery, request from my son, Hanan Edery, to ensure on my behalf, that I will be buried in the Land of Israel, next to my husband and my son, may they rest in peace." The document indicated that it was witnessed by Dr. David Kadosh. Also attached was a copy of an e-mail from Dr. Kadosh to Hanan, recounting that Kadosh had had a conversation with Sultana about burying his own father in Israel. According to Dr. Kadosh, Sultana responded that Kadosh's father was "a very Lucky man to have great kids that would do that for him[;] that[']s what I wish my kids would do for me." Hanan and Paul filed a request for "an emergency hearing to lift the temporary restraining order." And they filed other papers intended to persuade the circuit court of their mother's desire to be buried in Israel.

When the case came up for a hearing on the majority siblings' request for a preliminary injunction, the court acknowledged the parties' need for an expeditious resolution of their dispute. The court asked counsel for the majority siblings whether she would be amenable to proceeding that day with a hearing on the request for a final injunction. Counsel responded that the supporting testimony would be the same at either hearing, and she had "no problem" with proceeding on the majority siblings' request for a final injunction.

The court then inquired of Hanan: "Do you understand what I'm talking about, sir?" Hanan responded: "Yes. I would like to proceed on this as quickly as possible today." After some discussion about the possible need for an interpreter to assist Hanan and Paul, who were both self-represented, Hanan asked to be heard, and stated: "We want to proceed. . . ." The court inquired: "Well, are you telling me that you want to proceed without the assistance of a Hebrew interpreter." Hanan replied: "Right. Correct." The court then addressed Paul and asked: "Mr. Paul Edery, do you agree?" Paul confirmed his agreement to proceed.

Michael Ben–Canaan then testified that he was the oldest son of Sultana Edery. He stated that his mother was gravely ill, and had been mentally incompetent for the past three years. Michael acknowledged that his brother Paul had sent him three documents in February of 2007, purportedly signed by Sultana on July 15, 2003, appointing Hanan her attorney in fact, and designating him to serve as her health care agent to make health care decisions for her in accordance with her advance directives. The will dated July 15, 2003, appointed Hanan to serve as personal representative of Sultana's estate; the will named Paul as an alternate personal representative. Michael said he could not confirm that the initials on those documents were in fact his mother's customary initialed signature, but he noted that, in any event, none of those three documents mentioned a preference as to place of burial.

Michael further acknowledged that, after the majority siblings initiated the suit for injunctive relief, he had observed, among the responsive documents filed with the court by Hanan and Paul, a copy of the hand-written document his mother had allegedly signed in 2006 with respect to being buried in Israel. Michael testified that, prior to filing suit, he had never seen nor heard of such document.

On direct examination, Michael was asked: "Mr. Ben–Canaan, do you know where your mother wants to be buried upon her death?" He replied: "Without a shadow of a doubt, she always mentioned to me that she wanted to be buried amongst and where her children reside, namely here in the United States, Montgomery County." To accommodate that wish, the majority siblings had purchased a burial lot for Sultana in Mt. Lebanon Cemetery, in Adelphi, Maryland.

According to Michael, it would not even be possible for Sultana to be buried in the same cemetery as her deceased son and spouse because "[t]hat cemetery is filled to the brim." The next closest cemetery in Israel was 15 minutes away, and Sultana's daughter who resides in Israel is approximately 200 miles away. Michael also testified that Jewish burial customs mandate burial before sundown on the day of death and the tradition of "sitting Shivah," both of which would be impossible for the family to accomplish if Sultana was to be buried in Israel.

Hanan called as a witness Felix Sabban, one of the persons who claimed to have been present on July 30, 2006, when Sultana initialed a statement indicating a wish to be buried in Israel. Sabban identified the hand-written document dated July 30, 2006. Sabban testified that the body of that document was written by Dr. David Kadosh, a dentist, who was, at the time, visiting Sultana in a nursing home in Montgomery Village. Hanan attempted to ask Sabban what Sultana had said that day about wanting to be buried in Israel. The transcript reflects the following:

BY MR. HANAN EDERY:

Q What did Sultana Edery tell Dr. Kadosh?

[COUNSEL FOR MAJORITY SIBLINGS]: Objection.

THE COURT: What she told Dr. Kadosh regarding where she wanted to be buried is not admissible. It's hearsay. So, I'll sustain the objection.

BY MR. HANAN EDERY:

Q Did you hear Sultana Edery say that she wanted to be buried in Israel?

A [BY FELIX SABBAN] Yes, I did.

[COUNSEL FOR MAJORITY SIBLINGS]: Objection.

THE COURT: Sustained. That's the same thing I just told you. He's the witness and he's reciting a hearsay statement. She's not available to be cross-examined on that and it's being offered to prove the truth of the matter that he's stating.

BY MR. HANAN EDERY:

Q Did Dr. Kadosh treat Sultana Edery?

A Yes.

Q And did he ask her that's what she wants?

A Yes.

[COUNSEL FOR MAJORITY SIBLINGS]: Objection.

THE COURT: Sustained. This document is not in evidence and are you offering it in evidence?

MR. HANAN EDERY: Yes.

After counsel for the majority siblings asserted an objection "as to the entire contents of this document as hearsay," the court asked Hanan to proffer the English translation of the document that was written in Hebrew. Hanan responded.

MR. HANAN EDERY: The document says, Sultana Edery wants her son Hanan Edery to insure that she is buried in Israel.... In Beersheva, Israel next to her son and her husband.

THE COURT: All right. That's hearsay. Because you're asking me to take that document to show that she wanted to be buried in Israel. So, it's hearsay and I can't admit that.

A second witness was called, and Hanan asked the witness if he knew where Sultana wished to be buried. Again, counsel for the majority siblings lodged a hearsay objection, and the court ruled: "Again, this calls for a hearsay answer. I wouldn't allow him over objection to answer that question because the response was hearsay."

Hanan then testified. He told the court that his mother, Sultana, had been "an observant Jew just like my father for all of her life. And she is . . . an Orthodox observant Jew." She was an Israeli citizen, and, at the time of the hearing, she was 86 years old. In the recent years prior to the hospitalization, Hanan and Paul had been principal caregivers for their mother. According to Hanan, although Sultana's health had been in decline for several years, her mental state had been good until the past year.

Hanan testified that he was present on July 30, 2006, when Dr. Kadosh prepared the hand-written document referring to burial in Israel. The transcript reflects the following:

A [BY HANAN EDERY] My mother also signed in my presence the document titled, all the three [sic] and then the request for burial in Israel. I was present and Dr. Kadosh spoke to—

Q [BY THE COURT] That's the document that I'm not admitting.

\* \* \*

A I was present. The document was written by Dr. Kadosh.

Q All right. Well, it doesn't, I understand what you're telling me but it doesn't matter.

A I want to explain it.

Q But it's not anything that I'm going to be able to consider because that document is not admissible.

A But I'm a witness here.

Q I know that you're a witness and it doesn't make it any less hearsay.

Nevertheless, Hanan testified: "My mother made me promise to her, just like I brought her from Israel to the United States, to take her back to Israel." He added: "Although she thinks that this is a great country, ... her love is Israel."

Hanan also disagreed with Michael's testimony about the lack of burial space in Israel. Hanan testified:

Because I spoke to the Israeli Hevrat Kadisha. It's called the burial society, the governmental agency that does, and what they are willing to do is create a space near, not exactly one next to the other but that's not what the important thing is. The important thing is that she will be buried where she wants to be buried. In Beersheva, Israel.

And the cemeteries get full. And they built a new cemetery adjacent, like a short distance from the old cemetery.... [I]f it was possible, by the religious Halakhah to move a body from one place to another, it would be done. But the Halakhah says you can bring a body from the Diaspora to Israel. You can uproot the bones to Israel, but not in Israel from one place to another. The importance of the burial in Israel is higher than whether you are buried one next to the other.

To accommodate their mother's wish, Hanan and Paul had purchased a burial plot for their mother in Beersheva, Israel, on December 11, 2008.

When Paul attempted to testify about a document he had obtained from one of his mother's former nurses, the court interjected: "[A]nything that your mom said about where she wanted to be buried is hearsay. Unless it complies with the testamentary law of this State and that means, unless it was in a will, or it complies with the Health General Article."

When the court asked Hanan if there were further witnesses, Hanan inquired about the possibility of having Dr. Kadosh testify via telephone from New York. The court responded:

THE COURT: But Dr. Kadosh, as I understand it, is simply going to give me hearsay testimony about what your—

MR. HANAN EDERY: He wrote this document.

THE COURT: Whether he wrote it, I don't think you're understanding what I'm telling you. I don't care if you bring in 50 people who tell me they heard your mom say she wants to be buried in Israel. It's still hearsay.

When the court offered Hanan a final opportunity to present any further testimony, Hanan stated:

> I just want to add for the record that I saw with my own eyes, the document that my mother specified exactly where she wants to be buried, in Israel, in Beersheva, Israel. And she specifically requested that her son, Hanan Edery, shall take care of all arrangements for the funeral and the burial in Israel, with my own eyes.

When the parties began closing arguments, the court, *sua sponte,* reconsidered its ruling to exclude the hand-written statement dated July 30, 2006. The court observed that, although hearsay, the document could come into evidence pursuant to HG § 5–509(a), which provides that a person over 18 years of age "may decide the disposition of the individual's own body after that individual's death ... by executing a document that expresses the individual's wishes regarding disposition of the body...."

After admitting the document, the court permitted counsel for the majority siblings to recall Hanan as a witness. Counsel for the majority siblings then asked Hanan a series of questions casting doubt on the authenticity of the document that purported to be an expression of Sultana's intent. Among the points brought out during this examination was the fact that the document had not been mentioned in several pre-hearing statements made by Hanan. The point was also made that Hanan had been briefly married to the sister of Dr. Kadosh. Hanan contended he could not remember when or for how long he was married to Dr. Kadosh's sister, although the doctor was a close personal friend. Counsel for the majority siblings suggested the Dr. Kadosh had owed Hanan a big personal favor to repay Hanan for having entered into a marriage of convenience with Kadosh's sister. In closing

argument, counsel for the majority siblings asserted that the hand-written document was a recently fabricated forgery.

When Hanan began his closing comments, the court advised him:

I don't doubt that you two were the primary caretakers in the later years of her life. And it may be on a non-legal level that I believe that she may have told you she wanted to be buried in Israel. . . .

\* \* \*

The problem is, I'm not applying religious law here. I'm applying the law and procedure of the State of Maryland. And I've already told you that except for the document which I reconsidered, because I quite frankly, erroneously excluded it.

Other than that document, which is being questioned now, there isn't any evidence that I have before me that she specifically wanted to be buried in Israel. . . . [T]he only evidence I have is this document which is called into question. . . .

\* \* \*

. . . I frankly do not doubt much of what you tell me about what your mom's wishes were, although, again, I cannot as a legal matter, consider that.

After a break, the court delivered its ruling from the bench, stating:

It goes without saying that this is a very, very tragic case for many reasons. Number one, although I'm sure that Sultana lived a long and happy life, the time of her demise is approaching and unfortunately her six surviving children cannot agree and have divided themselves into two groups over where her remains will be buried. And I can tell you that as a human being, as a Jew, my heart goes out to all of you.

\* \* \*

[I]t's clear to me that under Maryland law, there are really two ways that a person makes provision for the disposition

of their body upon death. One is by last will and testament. The second is pursuant to a document prepared under [HG §] 5–509.

I think everyone can concede, after reviewing the last will and testament, that there is no provision made therein for the disposition of Sultana's body upon her death. . . .

The document that I . . . initially did not admit into evidence, but then reconsidered and admitted, was a document that was allegedly prepared on July 30, 2006, and . . . the parties have agreed that it says in Hebrew, expresses the desire of Sultana to be buried in Israel. . . .

\* \* \*

. . . I think it's quite possible, that Sultana wanted to be buried in Israel, or wants to be buried in Israel. Her husband is there. Her son is there. Sometimes when you outlive one of your children, there's no more heartbreaking thing and you may want to be with that child in eternity.

But as I said earlier in this case, I have to decide this law [sic] not based on passion or sympathy or pity. I have to base it on the secular law of the State of Maryland. . . .

. . . I really am not comfortable with this document dated July 30, 2006. I'm just not comfortable with it. It just doesn't make sense to me that it never got mentioned before. It doesn't make sense to me when I look at the signature of Sultana three years prior. It doesn't look like her signature. . . . It's very tough for me to point fingers in this case. It really is. Because everybody is hurting here. But I can't accept this document. I just can't accept it.

So, based upon that, I have to go back to the statute, 5–509 of the Health General Article, because having found that this is not a valid document by which Sultana made known her wishes, I have to go to the priority of disposition authority in absence of writing . . . under (d)(2) of 5–509.

. . . I do certainly credit what Hanan said about the fact that this is not really about the wishes of the children. It's about the wishes of Sultana. But, unfortunately, because I can't consider hearsay and I haven't allowed this document

to come in [sic], her wishes really are unknown to me, as a legal matter. I don't know what she wants to do.

The court concluded that it was appropriate to appoint the majority siblings "as agents to deal with their mother's remains upon her demise," and, because they would suffer irreparable damage if Hanan or Paul interfered, the court concluded that injunctive relief was appropriate. On February 20, 2009, the court entered a written order that provided, in pertinent part:

For the reasons stated upon the record at the conclusion of the hearing, the court enters the following declaratory judgment: Neither a Durable Power of Attorney; Last Will and Testament; nor Living Will/Advanced Directive & Appointment of Health Care Agent, all dated July 15, 2003, and signed by SULTANA EDERY, constitute evidence of SULTANA EDERY'S desire to be buried in Israel after her death, nor do any of those documents grant authority to any other person to make the decision as to the site of her burial. Furthermore, the handwritten document, dated July 30, 2006, written in Hebrew and purporting to evidence SULTANA EDERY's desire to be buried in Israel, is of no force or effect.

It is therefore, this 19th day of February, 2009, by the Circuit Court for Montgomery County, Maryland

ORDERED, that the Complaint for Injunctive Relief is hereby GRANTED, and it is further

ORDERED, that Defendants are hereby permanently enjoined from representing to any persons, agencies, or medical facilities that they, or either one of them, have authority to arrange for the final disposition of the body of SULTANA EDERY upon her death, and it is further

ORDERED, that Defendants are hereby enjoined from removing the body of SULTANA EDERY from the State of Maryland upon her death, and it is further

ORDERED, that Plaintiffs are hereby appointed as authorizing agents under the provisions of MD.CODE ANN., HEALTH GENERAL § 5–509(c) and (d) to arrange for the final

disposition of the body of SULTANA EDERY upon her death, and any one of them may make such arrangements in the absence, and on behalf, of the others.

On the evening of February 21, 2009, Sultana Edery died. She was buried in Mt. Lebanon Cemetery in Adelphi, Maryland, on February 23, 2009.

On the tenth day after the circuit court entered its written order, Hanan and Paul, through counsel, filed a motion "[p]ursuant to Md. Rule 2–534," asking the court to reopen the judgment and receive additional evidence.[1] The motion asserted that "the judgment is replete with grave error—both serious evidentiary error, misinterpretation of the relevant statute, and a very serious due process violation." The motion alleged that the court had improperly converted a preliminary injunction hearing into a final merits hearing without fully apprising Hanan and Paul of the consequences, such as the inability to take the testimony of Dr. Kadosh via telephone. Further, the motion asserted that the court had improperly rejected proffered hearsay testimony relevant to Sultana's desire to be buried in Israel. The motion asserted that such testimony was admissible as an exception to the hearsay rule under two theories: (1) an implied exception based upon the language of HG § 5–509(c), which begins with the phrase "Unless a person has knowledge that contrary directions have been given by the decedent,"; and (2) Maryland Rule 5–803(b)(3), which excepts from the hearsay rule "[a] statement of the declarant's then existing state of mind . . . offered to prove the declarant's then existing condition or the declarant's future action. . . ." The motion was denied, and this timely appeal followed.

---

1. Maryland Rule 2–534 provides, in part: "In any action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment."

## Mootness

 At the outset, we must consider the majority siblings' contention that the case is now moot. Although the mother's body is now interred, Hanan and Paul have stated that it is their intent to pursue disinterment and relocation of their mother's body to Israel. Hanan and Paul argue in this Court that the language in the circuit court's order permanently enjoining them from removing the body of Sultana from the State of Maryland upon her death "could be misread" to preclude them from taking "legitimate steps to seek and obtain disinterment" of the body for re-burial in Israel. We agree that the judgment issued in this case could arguably have a preclusive effect upon such efforts. Such potential consequences "preclude this appeal from being moot." *In re Joseph N.*, 407 Md. 278, 305, 965 A.2d 59 (2009). Accordingly, we will not dismiss this appeal.

## Questions Presented

Hanan and Paul have raised several questions. We conclude that we need only address the second one, namely: "Whether oral and written hearsay testimony about Sultana's wishes to be buried in Israel upon her death should have been admitted under Health–General § 5–509(c)." Because we agree with the appellants' contention that the trial court erred in excluding such evidence as hearsay without recognizing that such evidence was admissible under the "state of mind" exception to the hearsay rule, we will vacate the court's order and remand the case for such further proceedings as may be appropriate given the changed circumstances.[2]

---

**2.** The other four questions presented by appellants were as follows:

 1. Whether the Court's invalid, and illegally extended, TRO and illegal de facto preliminary injunction violated due process.

 \* \* \*

 3. Whether the due process rights of *pro se* defendants, Paul and Hanan Edery, were violated when the court secured their consent to a consolidated merits hearing by representing that they waived discovery rights only and without informing them that only in-person

### Discussion

Subsection 5–509(a) of the Maryland Health–General Article permits a person over 18 years of age to "decide the disposition of the individual's own body after that individual's death" and to document that decision "by executing a document that expresses the individual's wishes regarding disposition of the body or by entering into a pre-need contract." Subsection 5–509(b) requires that, "[i]n order to be valid," such a document "must be written and signed by the individual in the presence of a witness, who, in turn, shall sign the document in the presence of the individual."

Subsection 5–509(c) is captioned *"Priority of disposition in absence of writing,"* and provides:

Unless a person has knowledge that contrary directions have been given by the decedent, if a decedent has not executed a document under subsection (a) of this section, the following persons, in order of priority stated, have the right to arrange for the final disposition of the body of the decedent, including by cremation under § 5–502 of this subtitle:

(1) The surviving spouse of the decedent;

(2) An adult child of the decedent;

(3) A parent of the decedent;

(4) An adult brother or sister of the decedent;

(5) A person acting as a representative of the decedent under a signed authorization of the decedent;

(6) The guardian of the person of the decedent at the time of the decedent's death, if one has been appointed; or

---

testimony would be accepted, and then denying them a continuance to present such testimony.

4. Whether the trial judge abused his discretion by denying the motion to open the judgment to reconsider and receive additional evidence demonstrating Sultana's expressed wishes to be buried in Israel.

5. Whether the order restraining removal of Sultana's body upon her death outside Maryland is overbroad and hence an abuse of discretion.

(7) In the absence of any person under paragraphs (1) through (6) of this subsection, any other person willing to assume the responsibility to act as the authorizing agent for purposes of arranging the final disposition of the decedent's body, including the personal representative of the decedent's estate, after attesting in writing that a good faith effort has been made to no avail to contact the individuals under paragraphs (1) through (6) of this subsection.

Subsection 5–509(d) provides for the majority members of a class to serve as the authorizing agent:

(d) *Authorizing agents—In general.*—(1) Subject to paragraph (2) of this subsection, if a decedent has more than one survivor under subsection (c)(1) through (4) of this subsection, any adult child, parent, or adult brother or sister of the decedent who confirms in writing to a practitioner that all of the other members of the same class have been notified may serve as the authorizing agent for purposes of § 5–502 of this subtitle unless the practitioner receives a written objection to the cremation from another member of that class within 24 hours.

(2) If a decedent has more than one survivor under subsection (c)(1) through (4) of this section, the majority of a class may serve as the authorizing agent.

Hanan and Paul attempted to offer evidence that Sultana had made various oral statements expressing her wish to be buried in Israel. The trial court acknowledged that Sultana may have made such statements, and that "it's quite possible[ ] that Sultana wanted to be buried in Israel, or wants to be buried in Israel." Nevertheless, the court was of the view that the hearsay rule precluded the court from considering any evidence of oral statements made by Sultana about her desire to be buried in Israel. As a consequence, the court concluded that, "unfortunately, because I can't consider hearsay," and because the court had ruled the hand-written document too questionable to accept, "her wishes are unknown to me, as a legal matter. I don't know what she wants to do."

Given that state of the record, the court relied upon HG §§ 5–509(c)(2) and (d)(2) to appoint the majority siblings as the authorizing agent.

■ In their post-trial motion to alter or amend pursuant to Rule 2–534, and in this Court, Hanan and Paul argue that the trial court erred in refusing to admit the proffered statements allegedly made by Sultana under one of two exceptions to the hearsay rule. First, they argue that statutory language in the first phrase of HG § 5–509(c)—"Unless a person has knowledge that contrary directions have been given by a decedent"—creates by necessary implication a specific exception to the hearsay rule. We see no merit in that argument.

Maryland Rule 1–101(e) provides: "Title 5 [*i.e.*, the Maryland rules of evidence] applies to all actions in the courts of this State, except as otherwise provided by statute or rule." The General Assembly is fully capable of expressly legislating exceptions to the rules of evidence when that is their legislative intent. *See, e.g.*, Maryland Code (1973, 2006 Repl. Vol.), Courts and Judicial Proceedings Article, Title 10, containing numerous statutes with respect to admissibility of evidence. In the absence of such express statements of legislative intent, we decline to infer that a statute creates an implied exception to the Maryland rules of evidence set forth in Title 5 of the Maryland Rules. We reject the appellants' contention that the first phrase of HG § 5–509(c) creates an implied exception to the hearsay rule.

■ Appellants' second argument, however, as to why evidence of their mother's statements should have been admitted, is sound. Although hearsay is generally excluded from evidence pursuant to Rule 5–802, several exceptions to the rule of exclusion are set forth in Rule 5–803. It appears to us that the trial court gave no consideration to whether any exception applied to Sultana's statements, even after appellants, in their post-trial motion, referred the court to Rule 5–803(b)(3).

Rule 5–803(b)(3) provides that a hearsay statement as to the declarant's then existing state of mind is not excluded by the

hearsay rule. The exception allows the admission of the following hearsay:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Professor Lynn McLain has said of this exception:

Maryland has long recognized ... the common law hearsay exception for statements of the declarant's "state of mind," regardless of whether the declarant is available to testify, unavailable to testify, or testifies in the case. Under this exception, codified in Md. Rule 5–803(b)(3), a statement of the declarant's then existing state of mind is admissible to prove the truth of the matter asserted, except that it is generally inadmissible (except in will and probate cases) to prove a fact that purportedly happened before the statement was made.

\* \* \*

When the declarant's state of mind is relevant, ... the declarant's assertion as to his or her state of mind is admissible to prove that the declarant had that particular state of mind (emotion, feeling, etc.) and therefore also had it at the time relevant to the case. ... Direct assertions by the declarant as to the declarant's state of mind are admissible under this hearsay exception. Statements that provide circumstantial evidence of the declarant's state of mind are not excluded by the hearsay rule either, but this is because they are nonhearsay, as they are not offered to prove the truth of the matter asserted.

6A LYNN MCLAIN, MARYLAND EVIDENCE § 803(3):1 at 198–99 (2001) (footnotes omitted).

The Maryland appellate cases that have considered application of Rule 5–803(b)(3) have primarily considered whether a

hearsay statement was admissible to prove intent. *E.g., Figgins v. Cochrane,* 403 Md. 392, 419–22, 942 A.2d 736 (2008) (intent to transfer property to declarant's daughter); *YIVO Institute v. Zaleski,* 386 Md. 654, 674, 874 A.2d 411 (2005) (intent of testator to satisfy testamentary bequest by making inter vivos gift); *DAR v. Goodman,* 128 Md.App. 232, 237–39, 736 A.2d 1205 (1999) (testatrix's intent to leave her residuary estate to a charitable entity). Because the disposition of a person's body after death is normally accomplished by persons other than the deceased, statements that a person may make regarding wishes for final disposition are more in the nature of desires than intent.

In the present case, Hanan and Paul argued, correctly, that the selection of an authorizing agent pursuant to the priorities assigned by HG § 5–509(c)(1) through (c)(7) is not to occur if "a person has knowledge that contrary directions [regarding disposition] have been given by the decedent." Accordingly, Hanan and Paul attempted to introduce evidence "that contrary directions ha[d] been given by" their mother.

Sultana's preference regarding disposition of her body was one of the ultimate facts the trial court was asked to decide. Accordingly, when Hanan proffered that, on some prior occasions, Sultana had said to him and others, "I want to be buried in Israel," each such statement was hearsay because it was being offered to prove the truth of the matter asserted by the declarant. Nevertheless, such a statement should have been admitted under the state of mind exception because it was "[a] statement of the declarant's then existing state of mind . . . (such as intent, . . . design, [or] mental feeling . . . ), offered to prove the declarant's then existing condition or the declarant's future action. . . ."

The rationale for admitting such hearsay was explained as follows in 2 McCORMICK ON EVIDENCE (6th ed. Kenneth S. Broun) § 274 at 267–69 (footnotes omitted):

As with statements of bodily condition, the special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sinceri-

ty. The guarantee of reliability is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement. In addition, some formulations of the exception require that the statement must have been made under circumstances indicating apparent sincerity, although Federal Rule 803(3) imposes no such explicit condition.

Such statements are also admitted under a version of the same necessity argument that supports most hearsay exceptions. Often no better way exists to prove a relevant mental or physical condition than through the statements of the individual whose condition is at issue. Even with cross-examination, the alternative of using the declarant's testimony is not likely to be a better, and perhaps [may be] an inferior, manner of proof. If the declarant were called to testify, "his own memory of state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said." [Quoting *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892).] As a result, unavailability of declarant is not required.

In the frequently cited *Hillmon* case that was quoted in the above passage from MCCORMICK ON EVIDENCE, the Supreme Court quoted with approval, 145 U.S. at 298, 12 S.Ct. 909, the following statement about the state of mind exception to the hearsay rule: "[W]herever it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions, there you may prove what he said, because that is the only means by which you can find out what his intentions were." (Citation omitted.)

Similarly, Professor McLain has stated:

[T]he rationale for admitting an assertion of the declarant's present state of mind or emotion in order to show that the declarant had that state of mind when he or she spoke is that not only can there be no memory problem, but also no one could better perceive the declarant's state of mind than the declarant. The statement will be admissible for this

purpose as long as circumstances do not indicate that the declarant was insincere.

McLain, *supra*, at 202 (footnotes omitted).

In the present case, Hanan asserted that his mother had stated that it was her desire that she be buried in Israel. Such an assertion would have reflected Sultana's state of mind, namely, a want or desire, and a sense of emotional attachment to the place her husband and deceased son were buried. As the authors of McCormick on Evidence indicate, there is probably no better evidence of her state of mind with respect to her burial wishes than her own statements on that subject.

■ Accordingly, the trial court erred in refusing to admit into evidence and consider statements that Sultana may have made expressing her wishes with respect to final disposition of her body. The court should have considered such statements, along with other evidence admitted, before making its finding as to whether Sultana had given directions for the final disposition of her body. We vacate the judgment that was entered, and remand the case for such further proceedings as may be appropriate. In doing so, we recognize that the circumstances have changed greatly since the time when the trial court made its ruling. We express no opinion with respect to the course of action the court of equity should follow upon remand.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**